## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## DETROIT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF MICHIGAN ex rel. SAJITH MATTHEWS, M.D., and WILLIAM BERK, M.D. ) ) ) ) ) | |
| Plaintiff-Relators, ) | Case No. _____ |
| ) | **JURY TRIAL DEMANDED** |
| v. ) | **FILED UNDER SEAL** |
| ) | |
| TENET HEALTHCARE CORPORATION; ) and DETROIT MEDICAL CENTER, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

1.     Relators Sajith Matthews, M.D. and William Berk, M.D. ("Relators"), bring

this action on behalf of themselves, the United States of America, and the State of

Michigan against defendants Tenet Healthcare Corporation and Detroit Medical

Center, for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*.,

and Michigan Compiled Laws 400.601 *et seq.* (collectively, the "False Claims

Act").

2.     In order to acquire a higher reimbursement rate, Defendant Tenet Healthcare

Corporation ("Tenant") and a hospital system it controls, Defendant Detroit

Medical Center ("DMC"), fraudulently bill for inpatient care when patients are held

in emergency departments ("EDs"), a practice known as "boarding." Because they

have not yet been given access to an inpatient bed and the attendant care, boarded patients ought to be billed as outpatient.

3.      Moreover, Defendants refuse to spend resources to provide care for the crowded EDs created by the boarded patients. As a result, boarded patients in Defendants' EDs not only do not receive the billed-for inpatient care, they are frequently not even receiving observation level of care expected in an ED setting. As a result, patients are dying.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b), and 28 U.S.C. §§ 1331, 1345.

5.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as one or more of the defendants resides or transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## GOVERNMENT HEALTHCARE PROGRAMS

6.      Title XVIII of the Social Security Act, U.S.C. §§ 1395 *et seq.,* establishes the Health Insurance for the Aged and Disabled Program, known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

7.     The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient care, medical supplies, and laboratory services. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

8.     Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual").

9.     Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

10.    Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes the Medicaid program, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

11.    TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

12.    Veterans of the United States military receive insurance benefits ("VA Insurance") through the Veterans Health Administration, a component of the U.S. Department of Veterans Affairs.

13.    The Federal Employees Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. Under the

FEHBP, the federal employee is covered by private payer health insurance which is in turn subsidized in part by the federal government.

14.     Together, the programs described above, and any other government-funded healthcare programs, are referred to as "Government Healthcare Programs" or "Government Insurance."

15.     A Government Healthcare Program may act as a primary payer or a "secondary payer," meaning that it will pay costs that the primary payer does not, including deductibles and copayments.

### SERVICES MUST BE MEDICALLY NECESSARY AND PERFORMED ECONOMICALLY

16.     Reimbursement practices under all Government Healthcare Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic reimbursement requirement under Medicare, Medicaid, and other Government Healthcare Programs is that the service provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (Medicare does not cover items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."); 5 U.S.C. § 8902(n)(1)(A) (FEHBP will not cover any treatment or surgery that is not medically necessary); 32 C.F.R. § 199.6(a)(5)(TRICARE provider has an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary."); 42 C.F.R.

§§ 411.15(k)(1), 411.406; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme."); *United States v. Rutgard*, 116 F.3d 1270, 1275-76 (9th Cir. 1997) (holding that TRICARE and the Railroad Retirement Health Insurance Program follow the same rules and regulations as Medicare, citing, *e.g.*, 32 C.F.R. § 199.4(a)(1)(i)).

17.    Healthcare providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3); see also 32 C.F.R. § 199.6(a)(5) (TRICARE services and supplies must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care").

18.    These requirements prohibit defendants from manipulating billing procedures in "an intentionally wasteful manner" that maximizes their own economic benefit while providing no patient benefit. *United States ex rel. Kneepkins v. Gambro Healthcare, Inc*., 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000).

Thus, "while there is no requirement that the least costly alternative treatment be used," requests for payment become false when they are the result of "policies to artificially (i.e., unreasonably and unnecessarily) increase the quantity of items and amount of services provided to their patients without regard to medical necessity." *United States ex rel. Vainer v. DaVita, Inc*., 2012 WL 12832381, at *6 (N.D. Ga. Mar. 2, 2012).

19.     Providers who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, regulations, and program instructions. *See, e.g.,* Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

20.     Claims submitted by healthcare providers to Government Healthcare Programs contain similar representations and certifications. *See, e.g*., Forms CMS-1500 (paper provider claim form used for Medicare, Medicaid, TRICARE, FEHBP and OWCP); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for Medicare and Medicaid); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so

subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law, including, for example, the relevant Government Healthcare Program laws and regulations. Government Healthcare Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

21. For these reasons, courts have routinely held that the medical necessity requirement is material under the False Claims Act. *See, e.g., Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.,* 953 F.3d 1108, 1122 (9th Cir. 2020).

## **PARTIES**

22. Tenet Healthcare Corporation is a for-profit healthcare services company based in Dallas, Texas. Through its subsidiaries, joint ventures and partnerships, Tenet operates approximately 700 healthcare facilities throughout the United States, including 61 acute care and specialty hospitals, 465 ambulatory surgery centers and 110 other outpatient facilities, among others.

23. Relevant here, Tenet acquired Detroit Medical Center in 2013. Detroit Medical Center is a subsidiary of Tenet. According to its website, DMC is

comprised of six acute care hospitals (Detroit Receiving Hospital, Harper University Hospital, Huron Valley-Sinai Hospital, Hutzel Women's Hospital, Rehabilitation Institute of Michigan, and Sinai-Grace Hospital) and two ambulatory surgery centers (Berry Surgical Center and Harper Outpatient Surgery Center).

24.     Tenet reported in its 2022 Third Quarter financial report that its fiscal year 2022 Adjusted EBITA Outlook range to be $3.375 billion.

25.     DMC touts itself as a leading academically integrated healthcare system in metropolitan Detroit.

26.     DMC is the largest healthcare provider in southeast Michigan, with more than 2,000 licensed beds and 3,000 physicians.

27.     DMC is affiliated with, and its facilities are staffed by physicians from, the medical schools of Wayne State University and Michigan State University. DMC's Executive Management Team operates out of its headquarters located at DMC's Adult Central Campus/University Health Center, 4201 St. Antoine, Detroit MI, 48201.

28.     Relator Dr. Sajith Matthews is an Attending Physician in internal medicine at DMC's Detroit Receiving Hospital and teaches at Wayne State University School of Medicine. Dr. Matthews is board certified in internal medicine. Because

of DMC's affiliation with Wayne State, Dr. Matthews both teaches and practices as an Attending Physician at DMC's acute care hospitals.

29.    Dr. Matthews received his medical degree from Howard University College of Medicine in Washington, D.C., in 2009. He completed his residency in internal medicine at Wayne State University School of Medicine/Detroit Medical Center in 2012. Since 2015, Dr. Matthews has served as a teaching physician at Wayne State University School of Medicine while also treating inpatient internal medicine patients primarily at DMC's Detroit Receiving Hospital.

30.    Through this direct treatment of patients, Dr. Matthews has firsthand knowledge of and personally witnessed the allegations contained in this complaint.

31.    Relator Dr. William Berk is an Attending Physician in Emergency Medicine at DMC's Detroit Receiving Hospital and teaches at Wayne State University School of Medicine. Dr. Berk is board certified in internal medicine and emergency medicine. Because of DMC's affiliation with Wayne State, Dr. Berk both teaches and practices as an Emergency Medicine Physician at DMC's acute care hospitals.

32.    Dr. Berk received his medical degree from the University of Michigan in 1979 and completed his residency in internal medicine at the University of Michigan Hospitals in 1982. Dr. Berk has been an Attending Physician in Emergency Medicine with DMC continuously since 1987, with a prior stint in that

same position from 1984 through 1985. Dr. Berk has also taught at Wayne State University since 1987. Dr. Berk served as the Medical Chief Information Officer of Detroit Receiving Hospital from 2012 through 2016 and is presently the Chief Quality/Safety Officer of the Emergency Department (since 2012) and the Chief of Staff of Detroit Receiving Hospital (since 2014), among other leadership positions.

33.     Through his direct treatment of patients at Detroit Receiving Hospital Dr. Berk has firsthand knowledge of and personally witnessed the allegations contained in this complaint.

## FACTUAL ALLEGATIONS

34.     Defendants routinely bill Medicare, Medicaid and other government healthcare programs for inpatient care that was not delivered or capable of being delivered at DMC's acute care hospitals' emergency departments.

35.     In its acute care hospitals, DMC's emergency departments ("ED") see patients who require inpatient admission to one of the many other hospital departments.

36.     However, often there is no inpatient bed available for a patient with an admission order. In such cases it is the Defendants' protocol that the patient is "boarded" in the ED until either an inpatient bed becomes available, or the patient is simply discharged, without ever being transferred to an inpatient bed.

37.     However, it is Tenet and DMC's protocol to bill government healthcare programs for ED boarded patients as if they were in the appropriate inpatient department as soon as an admission order is signed.

38.     Tenet and DMC do so even though the patient still physically present in the ED and is not receiving an inpatient level of care.

39.     This is a deliberate choice made by Tenet and DMC, in order to bill government healthcare programs for inpatient care, which is reimbursed at a much higher rate than ED/outpatient level of care.

40.     In addition, Tenet refuses to expend the resources necessary for the ED boarded patients to receive even minimally appropriate level of observation care.

41.     This results in substandard care, patient harm, and great alarm for the physicians and staff who are attempting to care for the ED boarded patients.

42.     Relators, as well as other DMC physicians and staff, have routinely alerted both Tenet and DMC executive management of this ongoing problem with care and billing, to no avail.

43.     Tenet and DMC have knowingly submitted false claims to government healthcare programs for ED boarded patients that defendants know are neither treated in inpatient departments nor receiving inpatient level of care.

44.     This practice is ongoing and ED boarding by Defendants is actually increasing.

**Background Regulations**

45.     Generally, Medicare Part A (Hospital Insurance) covers inpatient hospital services and Medicare Part B covers outpatient hospital services including care in the emergency department. Medicare Part B will also cover most doctor services when a beneficiary receives inpatient services.

46.     CMS defines an inpatient as "a person who has been admitted to a hospital for bed occupancy purposes of receiving inpatient hospital services. Generally, a patient is considered an inpatient if formally admitted with the expectation that he or she will require hospital care that is expected to span at least two midnights and occupy a bed even though it later develops that the patient can be discharged or transferred to another hospital and not actually use a hospital bed overnight." Medicare Benefit Policy Manual, *Chapter 1 – Inpatient Hospital Services Covered Under Part A,* Revised 08-06-21.

47.     CMS considers a patient receiving emergency department services, observation services, outpatient surgery, lab tests, X-rays, or any other hospital services when not admitted to a hospital bed to be an outpatient, even if the patient spends the night in the hospital.

48.     Section 1886(d) of the Social Security Act (the Act) sets forth a system of payment for the operating costs of acute care hospital inpatient stays under Medicare Part A (Hospital Insurance) based on prospectively set rates. This

payment system is referred to as the inpatient prospective payment system (IPPS).

Under the IPPS, each case is categorized into a diagnosis-related group (DRG).

Each DRG has a payment weight assigned to it, based on the average resources

used to treat Medicare patients in that DRG.

49.     The base payment rate is divided into a labor-related and non-labor share.

The labor-related share is adjusted by the wage index applicable to the area where

the hospital is located, and if the hospital is located in Alaska or Hawaii, the

nonlabor share is further adjusted by a cost of living adjustment factor. This base

payment rate is multiplied by the DRG relative weight.

50.     If the hospital treats a high-percentage of low-income patients, it receives a

percentage add-on payment applied to the DRG-adjusted base payment rate. This

add-on, known as the disproportionate share hospital (DSH) adjustment, provides

for a percentage increase in Medicare payment for hospitals that qualify under

either of two statutory formulas designed to identify hospitals that serve a

disproportionate share of low-income patients. For qualifying hospitals, the amount

of this adjustment may vary based on the outcome of the statutory calculation.

51.     Also, if the hospital is an approved teaching hospital it receives a percentage

add-on payment for each case paid through IPPS. This add-on known as the

indirect medical education (IME) adjustment, varies depending on the ratio of

residents-to-beds under the IPPS for operating costs, and according to the ratio of residents-to-average daily census under the IPPS for capital costs.

52.     Finally, for particular cases that are unusually costly, known as outlier cases, the IPPS payment is increased. This additional payment is designed to protect the hospital from large financial losses due to unusually expensive cases. Any outlier payment due is added to the DRG-adjusted base payment rate, plus any DSH or IME adjustments.

53.     For services provided to outpatients, hospitals are reimbursed based upon the outpatient prospective payment system ("OPPS"). Under this system, the hospital submits Medicare claims based upon the individual services rendered to a beneficiary. It is widely known that hospitals receive significantly greater reimbursement from the IPPS than the OPPS.

54.     CMS describes observations services as "clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment, that are furnished while a decision is being made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital. Observation services are commonly ordered for patients who present to the **emergency department** and who then require a significant period of treatment or monitoring in order to make a decision concerning their admission or discharge." Medicare Claims Processing Manual, *Chapter 4 – Part B Hospital*,

Transmittal 290.1 – Observation Services Overview, Implemented 07-06-09 (emphasis added).

**Fraudulent Conduct**

55.    Relators both primarily treat patients at DMC's Detroit Receiving Hospital ("DRH"), but are aware that these fraudulent practices exist throughout DMC's acute care hospitals.

56.    DRH's emergency department has approximately 60 beds. However, beginning in 2020, it was not uncommon for there to be as many as 90 patients being boarded in DRH's emergency department waiting for an inpatient bed, even though an admission order had already been issued.

57.    Despite this, Tenet and DMC bill CMS and government payors as if the boarded patient had been moved to the appropriate inpatient department and was receiving inpatient care—meanwhile, many times the patient was simply sitting in a hallway on a gurney, receiving no care at all.

58.    Doctors and staff at DRH are extremely concerned with the level of care being provided to boarded patients and go as far as to call the situation unsafe for patients.

59.    Thus, not only are Defendants billing for inpatient services that were never provided, patients are held in an unsafe environment without even basic, observational level of care.

60.    To the best of Relators' recollection, ED boarding at DRH became an issue with the onslaught of the global COVID-19 pandemic. However, now close to three years beyond the advent of COVID-19, DRH continues to board ED patients and fraudulently bill them as inpatients.

61.    In fact, the boarding of ED patients by Defendants does not correlate to the rise and fall of COVID infections and appears to have increased over time.

62.    Both Defendants and their respective management are very aware of both the issue involving ED overcrowding/boarding and ED patients being billed as inpatients.

63.    In some instances, ED boarded patients remain in the ED for as many as 8 or 9 *days* before being transferred to an inpatient department.

64.    This results in more than a week of fraudulent inpatient billing (per patient) when the patient received no such care.

65.    This protocol is well known amongst ED physicians and inpatient physicians alike, as well as DMC's executive management team.

66.    Exemplifying this, the then-Chief of Emergency Medicine at DRH sent an email dated January 20, 2022 to various Tenet executives, including DMC's Chief Executive Officer of DMC Adult Central Campus, stating "some of the questions my docs are wanting to get answered. I know we won't have time for them all." The email goes on to list eight questions, number two of which states, "[L]ast time

I checked, there were 99 patients in the ER: 86 boarded and 13 active. What is being done to address boarding particularly as it pertains to upstairs nursing staff."

67.     Furthermore, the fourth item in this email states, "I have personally witnessed patients in hallways get the wrong medication because they were mixed up with another patient, had a hallway patient who was thought to have left who was still there, seen a patient in the hallway fall and get a subdural hematoma, multiple [sic] run out of oxygen. How is having overflowing hallway patients safer than double bunking?"

68.     Finally, the fifth item in this email references billing ED boarded patients as inpatients and asks, "[A]t what point is patient care considered to be transferred to the upstairs team. **It is my understanding that the upstairs team collects fee for services provided once the admission order is placed**. Is it fair or ethical to have the ER providing medical services for free when the upstairs doctors cannot be reached? Is there a window of time where there is a gray area? First 12 hrs, 24 hrs etc, that seems reasonable. Certainly 100+ hrs does not."  (emphasis added).

69.     This email (and others like it) have made it clear to Tenant executives that the common practice of ED boarding at DMC results in fraudulent inpatient billing, severely substandard care for ED boarded patients, and bad patient outcomes.

70.     This email met with no meaningful response. In fact, the same protocol

exists to this day, without billing or patient care changing in any way.

**Defendants Tracked Boarding Numbers**

71.     Defendants are very well aware of and track, down to the hour, the amount

of time ED boarded patients wait in the ED for an inpatient bed.

72.     Defendants have created a document entitled "ED Morning Report" which is

provided to the Executive Management Team each morning, along with an email

containing additional statistics on ED patients.

73.     The report details the ED's census from the day before and includes the

number of patients who had inpatient admit orders but were being boarded in the

ED due to lack of beds.

74.     The ED Morning Report includes the ED boarding numbers for DRH as well

as another DMC acute care hospital, Harper University Hospital ("Harper").

75.     For example, the June 27, 2022 ED Morning Report shows sixty-two

patients with admit orders being held in DRH's ED and forty-seven patients with

admit orders being held in Harper's ED.

76.     That report also states that "Harper continue[s] to have a high number of

Tele patients in the ED with over 100 hours that need to be reevaluated and

documented in the medical record."

77.     In other words, the report states that a "high number" of patients with admit orders to Harper's telemetry unit have been in the ED for over 100 hours, or more than 4 days.

78.     These patients were all billed as if they were receiving care in the telemetry unit for the duration of their 100 plus hour wait in the ED, while not receiving actual inpatient care.

79.     Another example, the June 11, 2022 ED Morning Report documents a smaller number of twenty-five patients with inpatient admit orders being boarded at DRH and twenty-nine at Harper.

80.     However, the report states that the "[L]ongest stay patient at DRH is 178 hours (over 7 days) and at Harper it is 85 hours (over 3 days)." Again, these patients were billed as inpatients despite being physically held in the EDs of both hospitals while not receiving inpatient level of care.

81.     Defendants created the ED Morning Report to track boarded patients and relevant statistics.

82.     Prior to the advent of the ED Morning Report, Defendants also had an automated email entitled "Emergency Department Capacity Alert."

83.     The Emergency Department Capacity Alert would automatically be sent to certain department heads at DRH to alert them to begin alleviating the capacity issue. According to Relators, that meant discharging patients from the ED if at all

possible. Likewise, the ED Morning Reports sometimes instruct to "activate ED decompression plan" when ED boarding reached a certain threshold. Again, the decompression plan was simply to discharge ED patients if it was at all possible.

84.    By way of example, the January 24, 2021 Emergency Department Capacity Alert documents that DRH began the day with twenty-one admitted patients being boarded/held in the ED and twenty-four by the end of the day at DRH.

85.    The number of patients being boarded in both DRH and Harper's EDs increased in 2022 over that which is documented in the Emergency Department Capacity Alerts, which are dated in early 2021 when the COVID19 pandemic was more severe.

86.    This suggests that the issue of ED boarding is not related to COVID19, but instead is a product of decisions by Defendants to hold patients without proper care in the EDs of its hospitals while billing for a higher level of inpatient care.

87.    Defendants possess yet another internal tool to track the number of patients it is boarding awaiting inpatient care. Defendants' have what is called the "ED Tracking Board" for each ED at its acute hospitals.

88.    The purpose of this spreadsheet, created from its Cerner software system, is to provide a real-time census of ED patients, including whether they have an admission order, how long they have been held in the ED, and other information relevant to the care of the patient.

89.    DRH's ED Tracking Board for December 6, 2022 identifies sixty patients as being boarded in the ED at DRH, with patients listed in order of longest boarding time to the least amount of boarding time. This number is significantly higher than typical boarding numbers seen in 2021, as documented in the Emergency Department Capacity Alerts referenced above.

90.    Astonishingly, forty-four of the sixty patients identified by the ED Tracking Board for December 6, 2022 had been held in the ED for longer than 24 hours.

91.    Even more astounding, the ED Tracking Board identifies twelve DRH patients that have been boarded in the ED for more than 100 hours (4.16 days) with the longest length of stay being an incredible 165 hours (approximately a week).

92.    All but 1 of the 12 patients held in the ED for an excess of 100 hours have inpatient admit orders. All 11 patients, as was Defendants' protocol, were billed as inpatients despite being held in the ED for multiple days.

93.    Defendants also keep a document entitled "DRH Operations Scorecard" that track the total number of hours that patients are boarded in the ED by each calendar month.

94.    The document shows that for each month in 2022, patients spent thousands of hours each month boarded in the ED while defendants billed that time as inpatient services.

95.    For example, in December 2022, patients spent a total of 24,246 hours

boarded in the ED at DRH. Again, Defendants consider a patient to be boarded in

the ED only after an admit order has been issued and inpatient services are being

billed. For December of 2022 alone, that equates to billing more than one thousand

inpatient treatment days for patients simply being held in DRH's ED.

**DRH Huddle Dashboard Spreadsheets**

96.    DRH maintains a "DRH Huddle Dashboard." These are daily spreadsheets

which track the total patient census at DRH, including patients in the ED. As

physicians at DRH, Relators have access to these Dashboards as part of their job

functions.

97.    Among other items, the spreadsheets contain a "Current Census" tab, which

provides key patient information, including the patient's location within DRH.

98.    Relators estimate that 70-80% of ED patients are government health

program beneficiaries and the DRH Huddle Dashboard spreadsheets support this

understanding: a majority of ED patients have a financial class listed as Medicare,

Medicare Advantage, Medicaid, etc.

99.    The DRH Huddle Dashboard spreadsheet for August 1, 2022 identifies

thirty-three ED boarded patients. Only two of the thirty-three patients had an

inpatient admit time and date of August 1, 2022. This means that the thirty-one

other ED patients had inpatient admit dates of July 31, 2022 or earlier while being held in the ED and billed as if they were being treated in an inpatient unit at DRH.

100.   The August 1, 2022 DRH Huddle Dashboard spreadsheet indicates that four of the ED boarded patients had been held in the ED for greater than four days while inpatient services were billed. Of note, all four of the ED boarded patients with a length of stay longer than four days in the August 1, 2022 DRH Huddle Dashboard spreadsheet are identified as either Medicaid or Medicare Advantage beneficiaries.

101.   The DRH Huddle Dashboard spreadsheets provide a wealth of data and confirm the factual allegations of Relators down to exact patients by day and payor.

102.   Defendants have all of this data and know exactly how many patients are simply being held in the ED while they bill for inpatient services that are not being provided.

**Patient Harm**

103.   In addition to fraudulently billing government payors for inpatient care not delivered, patients being boarded in the ED at Defendants' hospitals frequently receive substandard care leading to patient harm, and sometimes even death.

104.   As stated, Defendants simply choose not to expend resources to provide adequate care and to board ED patients. And of course, if Defendants chose to

transfer an ED patient with an admit order to another facility, they would lose the opportunity to bill for that patient's care.

105.   Below are five examples of patients who were harmed by these practices. Although egregious, these are by no means the only examples.

106.   Patient 1 was admitted to DRH's ED from a nursing home with a diagnosis of Sepsis. Patient 1 had an admit order date of August 2, 2022 at 02:43.

107.   Patient 1 was boarded in DRH's ED for almost seven days awaiting an inpatient bed, while the government was billed as if the patient had been properly admitted and was receiving inpatient care.

108.   Eventually, a proper transfer to an inpatient unit was documented in the patient's chart.

109.   Relators note that Patient 1's medical chart does not reflect ICU level care; in fact, his chart does not document vitals being checked and has no nursing notes in the chart for over 135 hours. Sadly, but not surprisingly, this patient died on August 16, 2022.

110.   Patient 2 has an admit order to the Neuro ICU on August 4, 2022 at 17:39 with a diagnosis of alcoholism, encephalopathy, and a urinary tract infection.

111.   Patient 2 was boarded in the ED for approximately 3 days before being properly transferred to the ICU on August 7, 2022 at 14:42.

112.   Relators review of Patient 2's medical chart reveals that while in the ED supposedly receiving (and being billed for) inpatient care, Patient 2 was not properly started on feeding, vitals were not checked, and he was not started on a long term EEG as requested by neurology consultants.

113.   Patient 3 presented to the ED at DRH with an infected corneal ulcer in her eye, requiring eyedrops every hour.

114.   Because of the critical nature of the care, Patient 3 received an admit order to DRH's ICU on February 22, 2022 at 19:23, because that was the only department capable of monitoring and delivering hourly eyedrops.

115.   Unfortunately, Patient 3 was boarded in the ED for approximately eight days without receiving the hourly eyedrops she required.

116.   As a result, she sustained a rupture of her eyeglobe necessitating its removal. She was finally transferred to the ICU on March 2, 2022.

117.   The substandard care Patient 3 received was billed as if it were inpatient ICU care, despite being in the ED for close to 8 days.

118.   Patient 4 was a 78 year old female who presented to the ED at DRH severely ill with sepsis, rhabdomyolysis, severe dehydration, and hyperosmolar coma.

119.   Patient 4 had an admit order to the MICU on December 23, 2021 at 18:51.

120.   Patient 4 was "downgraded to floor bed" from ICU status on December 26, 2021, although she remained in the ED the entire time until she was properly transferred to a floor bed on December 29, 2021 at 23:50.

121.   Patient 4 was boarded in the ED in excess of six days despite her chart indicating she needed ICU care (for three days) and an inpatient floor admission (for the other three days).

122.   Relator Matthews personally found Patient 4 in her own urine and stool, and due to this improper care, Patient 4 developed decubitus ulcers during her more than six days in the ED.

123.   Again, Patient 4's care was billed as if she were cared for as a proper inpatient both in the MICU and a floor bed—even though neither occurred—for six days.

124.   Patient 5 was an 88-year-old male who presented to DRH's ED with respiratory failure due to COVID-19.

125.   Patient 5 had an admit order of August 3, 2022.

126.   Patient 5 died in the ED after being boarded there for approximately thirty-six hours.

127.   Nursing notes indicate that Patient 5 was found expired on August 4, 2022 at 22:40, with his BIPAP breathing apparatus removed. It is unknown when the BIPAP was removed or when exactly Patient 5 died.

128.    Patient 5's care was billed as inpatient care while he was in the ED and apparently during the time during which he lay deceased, with no one monitoring whether his BIPAP apparatus was properly engaged.

## COUNT I
## VIOLATIONS OF 31 U.S.C. § 3729 – FEDERAL FCA

129.    Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

130.    As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

131.    As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

132.    Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. 31 U.S.C. § 3729.

133.    Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## COUNT II
## VIOLATIONS OF MICHIGAN COMPILED LAWS 400.601 et seq. – MICHIGAN MEDICAID FALSE CLAIMS ACT

134.   Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

135.   As set forth above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid program false or fraudulent claims for payment or approval, in violation of Mich. Comp. Laws § 400.607(1).

136.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of Mich. Comp. Laws § 400.607(3).

137.   Due to Defendants' conduct, the State of Michigan has suffered monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. Mich. Comp. Laws § 400.612(1).

138.   Relator is entitled to reasonable attorneys' fees, costs, and expenses pursuant to Mich. Comp. Laws § 400.610a(9).

## **PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment against Defendants:

    (a) awarding the United States treble damages sustained by it for each of the false claims;

    (b) awarding the United States a maximum civil penalty for each of the false claims, records, and statements;

(c) awarding the State of Michigan treble damages sustained by it for each of the false claims;

(d) awarding the State of Michigan the maximum civil penalty for each of the false claims, records, and statements;

(e) awarding Relator the maximum share of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(f) awarding Relator litigation costs and reasonable attorneys' fees; and

(g) granting such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Relator hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

Respectfully submitted,

*/s/ Julie Bracker*
Julie Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3355 Lenox Road, Suite 660
Atlanta, Georgia 30326
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com

Azzam Elder
Michigan Bar No. P53661
**Elder Brinkman, PLLC**

-30-

1360 Porter St. Suite 250
Dearborn, MI 48124
aelder@elderbrinkmanlaw.com
Telephone: (313) 582-5800

*Attorneys for Plaintiff-Relators*