## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA and the )
STATE OF MICHIGAN )
*ex relators* ERIK OLSEN, M.D., )
SAJITH MATTHEWS, M.D., )
and WILLIAM BERK, M.D. )
)
    Plaintiff-Relators, )   Case No. 23-cv-10903
)   Hon. Gershwin A. Drain
)   Mag. Judge Kimberly Altman
)
)   **JURY TRIAL DEMANDED**
v. )
)
TENET HEALTHCARE CORPORATION; )
and DETROIT MEDICAL CENTER, )
)
    Defendants. )

## AMENDED COMPLAINT

## INTRODUCTION

1.    This is an action filed by three independent Co-Relators pursuant to the

Qui Tam provisions of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 et

seq., to recover damages and penalties arising from the submission of false claims

to the United States and the Federal Medicare Program.

2.    This action is also filed pursuant to the Qui Tam provisions of the

Michigan Medicaid False Claim Act ("MFCA"), MCL § 400.610(10)(a)(1), to

recover damages and penalties arising from the submission of false claims to the State of Michigan Medicaid Programs.

3.    Relators Erik Olsen, M.D., Sajith Matthews, M.D., and William Berk, M.D. ("Relators"), bring this action on behalf of themselves, the United States of America, and the State of Michigan against defendants Tenet Healthcare Corporation and Detroit Medical Center, for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*., and Michigan Compiled Laws 400.601 *et seq.* (collectively, the "False Claims Act"). In order to acquire a higher reimbursement rate, Defendant Tenet Healthcare Corporation ("Tenant") and a hospital system it controls, Defendant Detroit Medical Center ("DMC"), fraudulently bill for inpatient care when patients are held in emergency room facilities ("ERs"), a practice known as "boarding." Because they have not yet been given access to an inpatient bed and the attendant care, boarded patients ought to be billed as outpatient.

4.    Moreover, Defendants refuse to spend resources to provide care for the crowded ERs created by the boarded patients. As a result, boarded patients in Defendants' ERs not only do not receive the billed-for inpatient care, frequently they do not even receive the observation level of care required in an ER setting. As a result, despite Tenet receiving significant tax payor resources to treat them, patients are dying.

5.     While some boarding in ERs is normal and even perfectly acceptable if staff is available to provide the necessary care, Tenet is well aware that such staff is often nonexistent but is boarding for excessive ratios and billing for ICU care without this staff being available, day after day, for profit.

6.     Co-Relators have complied with all notice provisions of both the Federal False Claims Act, 31 USC § 3730(b)(2) and the Michigan Medicaid False Claims Act, MCL § 400.610a(2), and provided a statement of material evidence and information related to this Complaint, which support the existence of the false claims by Defendants and have been reviewed by the respective agencies. As of the time of the filing of this Amended Complaint, the case is unsealed.

7.     This case is unusual in that all Co-Relators are highly respected emergency room and internal medicine physicians with decades of experience, who have chosen to go public listing themselves as Relators and pursue this matter for the good of the community they serve.

8.     The defendant, Tenet Healthcare Corporation ("Tenet"), has a history of facing actions such as this one.[1]

---

[1] See, e.g., *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, at 689 and fn. 5 (W.D. Tex. 2006); *United States v. Tenet Healthcare Corp.*, 343 F. Supp. 2d 922, 924 (C.D. Cal. 2004).

9.     Since purchasing the hospital system, the Defendant has transformed the DMC, a formerly nonprofit institution that was given considerable legislative and judicial deference due to Detroit Receiving being known as a "hospital of last resort" for the underserved inner-city population, into a cash cow that, as one executive admitted to Relators, is highly profitable for the for-profit Tenet.

10.     Tenet, primarily through managing the DMC with hedge fund economics, has aggressively billed Medicaid for services while systematically slashing staff and/or making excuses why appropriate staffing levels cannot be maintained, thus creating a situation in which the care billed for is not actually occurring under medical definitions (or even basic common sense).

11.     Thus, amidst horror stories of neglect and abuse within DMC walls, Tenet repeatedly reports record profits to its shareholders and even bragged in its February 8, 2022 shareholder update that the company is growing "with multiple sources of consistent revenue, free cash flow and growing profits" after having spent "the last couple of years trimming the fat in its hospital business." The same report included the fact that Tenet recorded $915 million in profit ($8.43 per share in the prior year) as a result of such cost-cutting measures coupled with business expansion efforts.

12.     The legal problem is that Tenet's hedge fund business model and aggressive billing for services that start from the moment of admission, coupled with

reduced staff and reduced available resources, has resulted in systematic fraudulent billing, such that the federal and state governments are routinely being billed for services that do not actually occur.

13.     Tenet seemingly gambles on the poverty-stricken population of inner city Detroit not having the resources to object to the fraudulent billing, while simultaneously taking advantage of historical deference provided to the DMC as a previously nonprofit "hospital of last resort."

14.     Tenet Health's actions as complained of herein are extremely profitable to Tenet Health and its shareholders and thus Co-Relators anticipate that Tenet Health will aggressively deny these allegations and defend with any number of theories and accusations.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b), and 28 U.S.C. §§ 1331, 1345.

16.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as one or more of the defendants resides or transacts business in

this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## GOVERNMENT HEALTHCARE PROGRAMS

17.    Title XVIII of the Social Security Act, U.S.C. §§ 1395 *et seq.,* establishes the Health Insurance for the Aged and Disabled Program, known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

18.    The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient care, medical supplies, and laboratory services. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

19.     Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual").

20.     Reimbursement for Medicare Part C claims is made by the United States through CMS, which makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

21.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes the Medicaid program, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

22.     TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered

to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

23.　　Veterans of the United States military receive insurance benefits ("VA Insurance") through the Veterans Health Administration, a component of the U.S. Department of Veterans Affairs.

24.　　The Federal Employees Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. Under the FEHBP, the federal employee is covered by private payer health insurance which is in turn subsidized in part by the federal government.

25.　　Additionally, during COVID, programs were established to provide additional reimbursement for hospital facilities during the pandemic, including the Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program (HRSA COVID-19 Uninsured Program).

26.　　Together, the programs described above, and any other government-funded healthcare programs, are referred to as "Government Healthcare Programs" or "Government Insurance."

27.　　A Government Healthcare Program may act as a primary payer or a "secondary payer," meaning that it will pay costs that the primary payer does not, including deductibles and copayments.

## <u>SERVICES MUST BE MEDICALLY NECESSARY AND PERFORMED ECONOMICALLY</u>

28.    Reimbursement practices under all Government Healthcare Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic reimbursement requirement under Medicare, Medicaid, and other Government Healthcare Programs is that the service provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (Medicare does not cover items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."); 5 U.S.C. § 8902(n)(1)(A) (FEHBP will not cover any treatment or surgery that is not medically necessary); 32 C.F.R. § 199.6(a)(5)(TRICARE provider has an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary."); 42 C.F.R. §§ 411.15(k)(1), 411.406; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme."); *United States v. Rutgard*, 116 F.3d 1270, 1275-76 (9th Cir. 1997) (holding that TRICARE and the Railroad Retirement Health Insurance Program follow the same rules and regulations as Medicare, citing, *e.g.*, 32 C.F.R. § 199.4(a)(1)(i)).

29.    Healthcare providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3); see also 32 C.F.R. § 199.6(a)(5) (TRICARE services and supplies must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care").

30.    These requirements prohibit defendants from manipulating billing procedures in "an intentionally wasteful manner" that maximizes their own economic benefit while providing no patient benefit. *United States ex rel. Kneepkins v. Gambro Healthcare, Inc*., 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000). Thus, "while there is no requirement that the least costly alternative treatment be used," requests for payment become false when they are the result of "policies to artificially (i.e., unreasonably and unnecessarily) increase the quantity of items and amount of services provided to their patients without regard to medical necessity." *United States ex rel. Vainer v. DaVita, Inc*., 2012 WL 12832381, at *6 (N.D. Ga. Mar. 2, 2012).

31.     Providers such as Tenet who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, regulations, and program instructions. *See, e.g.,* Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

32.     Claims submitted by healthcare providers to Government Healthcare Programs contain similar representations and certifications. *See, e.g.*, Forms CMS-1500 (paper provider claim form used for Medicare, Medicaid, TRICARE, FEHBP and OWCP); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for Medicare and Medicaid); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law, including, for example, the relevant Government Healthcare Program laws and regulations. Government Healthcare Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant

State health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

33.     For these reasons, courts have routinely held that the medical necessity requirement is material under the False Claims Act. *See, e.g., Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.,* 953 F.3d 1108, 1122 (9th Cir. 2020).

## BACKGROUND OF THE PARTIES

34.     Tenet is a for-profit, publicly traded healthcare services company (NASDAQ: THC) based in Dallas, Texas. Through its subsidiaries, joint ventures and partnerships, Tenet operates approximately 700 healthcare facilities throughout the United States, including 61 acute care and specialty hospitals, 465 ambulatory surgery centers and 110 other outpatient facilities, among others.

35.     Tenet reported in its 2022 Third Quarter financial report that its fiscal year 2022 Adjusted EBITA Outlook range to be $3.375 billion.

36.     As further discussed below in detail, Tenet acquired DMC in 2013.

37.     The DMC is a subsidiary of Tenet. The DMC is comprised of five acute care hospitals (Detroit Receiving Hospital, Harper University Hospital, Huron Valley-Sinai Hospital, Hutzel Women's Hospital, and Sinai-Grace Hospital, of which all but Huron Valley are in Detroit and serve inner city populations), a non-acute care hospital (Rehabilitation Institute of Michigan) and two ambulatory

surgery centers (Berry Surgical Center in Farmington Hills and Harper Outpatient Surgery Center in Detroit).

38.     Due to its extensive history as an academic facility that helps train medical students and residents, DMC is known as a leading academically integrated healthcare system in metropolitan Detroit.

39.     Indeed, the DMC is the largest healthcare provider in southeast Michigan, with more than 2,000 licensed beds and 3,000 physicians.

40.     DMC is affiliated with, and its facilities are staffed by physicians from, the medical schools of Wayne State University ("Wayne State") and Michigan State University. Due to the acuity of patient need and skill of faculty advisors such as the Relators, residencies in the DMC ER have long been extremely popular with trainees.

41.     DMC's Executive Management Team operates out of its headquarters located at DMC's Adult Central Campus/University Health Center, 4201 St. Antoine, Detroit MI, 48201.

42.     Relator Erik Olsen has been a Board-certified emergency room physician since 2009, and until recently taking a position at the Veteran's Affairs hospital in Detroit as a result of increased risk of malpractice under Tenet's management, he spent his entire career working at the hospitals owned by

Defendants, from his residency to his successful career as a staff physician and Residency Director.

43.     Dr. Olsen attended Wayne State from 2002 through 2006, and spent his final two years doing rotations at DMC. He completed a three-year emergency medicine residency at the Detroit Receiving Hospital in 2006, where he was elected Chief Resident, and then accepted a permanent position at Detroit Receiving Hospital.

44.     Dr. Olsen was appointed Associate Residency Director in 2014 and promoted to Residency Program Director in 2018. He also has held an assistant professor of clinical education position at Wayne State since 2011 and an adjunct professor position at Meharry Medical College Department of Surgery since 2020.

45.     While working at the VA Hospital, Dr. Olsen retains privileges at the DMC and continues to provide shift work there.

46.     Through his direct treatment of patients, Dr. Olsen has firsthand knowledge of and has personally witnessed the facts alleged in this First Amended Complaint.

47.     Relator Dr. Sajith Matthews is a board-certified Attending Physician in internal medicine at DMC's Detroit Receiving Hospital. Dr. Matthews received his medical degree from Howard University College of Medicine in Washington, D.C.,

in 2009 and completed his residency in internal medicine at Wayne State/DMC in 2012.

48.     Since 2015, Dr. Matthews has served also as a teaching physician at Wayne State while also treating inpatient internal medicine patients primarily at DMC's Detroit Receiving Hospital.

49.     Through this direct treatment of patients, Dr. Matthews has firsthand knowledge of and has personally witnessed the facts alleged contained in this First Amended Complaint.

50.     Relator Dr. William Berk retired from a position as an Attending Physician in Emergency Medicine at DMC's Detroit Receiving Hospital in late 2023. He also long served as a clinical professor at Wayne State Medical School, from 1987 through his retirement. Dr. Berk is board certified in both internal medicine and emergency medicine.

51.     Dr. Berk received his medical degree from the University of Michigan in 1979 and completed his residency in internal medicine at the University of Michigan Hospitals in 1982. He started as an Attending Physician in Emergency Medicine with DMC since 1984, with a brief break in 1986.

52.     Dr. Berk served as the Medical Chief Information Officer of Detroit Receiving Hospital from 2012 through 2016 and at his retirement was the Chief Quality/Safety Officer of the Emergency Department (a position he had held since

2012) and the Chief of Staff of Detroit Receiving Hospital (which he had held from 2008-2012 and again from 2014-2018), among other leadership positions.

53.    Through his direct treatment of patients, Dr. Berk has firsthand knowledge of and has personally witnessed the facts alleged in this First Amended Complaint.

54.    Based on these histories, each Relator has a deep understanding of the particular needs and challenges of running DMC, having been there since 2004 (for Dr. Olsen), 2012 (for Dr. Matthews) and as far back as 1987 (for Dr. Berk).

55.    The Relators' longstanding history at DMC has given them a unique perspective on the changes made at DMC since Tenet took over in 2013.

56.    Over the past near-decade, each Relator became independently concerned by the degradation of care at DMC after Tenet's acquisition.

57.    All Relators have made many complaints about this degradation in care, Tenet's views of "profit over patients," and the fraudulent billing practices described herein to executive management at both Tenet and DMC, to no avail.

58.    In fact, as stated, Tenet has continued to shield itself from government scrutiny by taking advantage of the DMC's historical position as the hospital of "last resort" while simultaneously billing for services that are simply not provided despite its aggressive billing.

## **TENET'S ACQUISITION OF THE DMC**

59.    Detroit Receiving Hospital is a Level One trauma center, primarily serving low-income urban residents.

60.    As addressed *supra*, due to the variety of traumas that routinely pass through Detroit Receiving Hospital, it is a highly sought after place for emergency room doctors to train and attracts exemplary students from all over the United States.

61.    Historically, as a nonprofit institution, DMC reported regular financial crises due to the expense and strain of operating in a low-income area with high acuity.

62.    However, the hospital system has in recent years been a popular acquisition for for-profit healthcare and upon information and belief, would be highly sought in the current field of hospital system mergers and acquisitions.

63.    In 2010, DMC was sold to Vanguard Health Systems ("VHS").

64.    VHS went public the very next year, in 2011.

65.    In 2013, Tenet Health purchased VHS, which included DMC.

66.    Since 2013, Tenet Health has owned and operated DMC.

67.     Since Tenet Health's acquisition of DMC, there have been numerous reports about the quality of healthcare declining as a result of Tenet Health's for-profit agenda.[2]

68.     In fact, the DMC was under supervision of a DMC Legacy Board oversight for years after the transition to a for-profit entity, which Board publicly complained that Tenet was not meeting its obligations.[3] The Legacy Board review has expired, leading to an increase of the issues they reported.

69.     Tenet/DMC do not employ emergency room physicians to staff the ER and ICU directly; rather, the hospital has a contract with a separate entity in which Relators Olsen and Berk were longtime partners.

**FRAUDULENT BILLING FOR "BOARDED" PATIENTS**

70.     During the Covid-19 pandemic, many hospitals, including the DMC, began to suffer staff shortages, especially with nursing staff. As a result, during the emergency conditions, patients were boarded in the ER (that is, waiting to be moved out of the ER into a different, specialized floor) for far longer than medically

---

[2] Report: Concerns about 'apparent decline' at DMC (freep.com), Fired cardiologists sue DMC, Tenet, alleging retaliation for quality complaints | Crain's Detroit Business (crainsdetroit.com), Michigan nurses' union accuses Tenet-owned Detroit Medical Center of slashing charity care spending | Fierce Healthcare
[3] https://www.detroitnews.com/story/news/local/detroit-city/2021/04/29/dmc-legacy-boards-last-oversight-report-says-system-kept-most-pledges/4888476001/   ("We had some concerns on whether there was cost-cutting in staffing such that services were not at the level that we would expect them to be").

reasonable. This was necessitated, for a time, by the demands of the pandemic, and in fact the same thing occurred for a period at other metro Detroit hospitals.

71.     During this same period, Tenet, like most large hospital organizations, took advantage of federal relief money available, including over $936 million in grants from the United States Provider Relief Fund and over $1.5 billion more in relief from Medicare Advance Payments and payroll tax match deferrals.[4]

72.     Despite this extensive federal aid, staffing levels did not improve and in many cases, worsened, even while other area hospitals restored essential staffing and services.

73.     Amidst accepting all this federal aid, Tenant reported record profits.

74.     This led certain Senators, including Elizabeth Warren, to publicly call out Tenet's management of federal healthcare dollars. *Id.*

75.     What those Senators did not realize at the time makes this use of federal dollars even more egregious: rather than actually providing the necessary ER and ICU staff for its Detroit patients, Tenet appears to be using its record profits to further invest in surgical centers—typically pure profit generators—and to line its pockets.

---

[4] Warren, Markey, McGovern, Trahan Call Out Tenet's Corporate Greed During COVID-19 Pandemic | U.S. Senator Elizabeth Warren of Massachusetts (senate.gov)

76.     Moreover, at the same time that it was furloughing staff for claimed budget reasons, and allegedly struggling to recruit and retain sufficient nurses, Tenet was continuing to bill for acute medical care as if the staff was actually providing the care, when there was no such staff present to provide the care.

77.      Specifically, Defendants routinely bill Medicare, Medicaid and other government healthcare programs for inpatient care that was not delivered or capable of being delivered at the DMC's acute care hospitals' emergency departments.

78.     In its acute care hospitals, the DMC's emergency facilities see—and often admit—patients who require inpatient admission to one of the many other hospital departments.

79.     However, often there is no inpatient bed available for a patient with an admission order. In such cases it is the Defendants' protocol that the patient is "boarded" in the ER until either an inpatient bed becomes available, or the patient is simply discharged, without ever being transferred to an inpatient bed.

80.     However, it is Tenet and DMC's protocol to bill government healthcare programs for ER boarded patients as if they were in the appropriate inpatient department as soon as an admission order is signed.

81.     Tenet and DMC do so even though the patient is still physically present in the ER and is not receiving an inpatient level of care.

82.     This is a deliberate choice made by Tenet and DMC, in order to bill government healthcare programs for inpatient care, which is reimbursed at a higher rate than ED/outpatient level of care.

83.     Under Medicare Advantage, also known as Medicare Part C, Medicare beneficiaries may elect their Medicare benefits through a private insurance plan offered by an insurance company, known as a Medicare Advantage Plan, or an "MA Plan." MA Plans are required to provide the same coverage and benefits as traditional Medicare. Even where the patients' payors are Medicare Advantage plans, which pay on a capitated rate, inflating the type of care provided leads to higher payments over the long term.

84.     In addition, Tenet refuses to expend the resources necessary for the ER-boarded patients to receive even a minimally appropriate level of observation care.

85.     This results in substandard care, patient harm, and great alarm for the physicians and staff who are attempting to care for the ER-boarded patients.

86.     Relators, as well as other physicians and staff, have routinely alerted both Tenet and DMC executive management of this ongoing problem with care and billing, to no avail.

87.     Tenet and the DMC have knowingly submitted false claims to government healthcare programs for ER-boarded patients that they know are neither treated in inpatient departments nor receiving inpatient level of care.

88.     Notably, although the emergency conditions of the pandemic are no longer present, the practice of ER-boarding is ongoing.

89.     In fact, ER boarding by Defendants is actually increasing.

90.     It was concerns about this continued and escalating use of the practice, coupled with the extremely bad patient outcomes they have been forced to witness, that brought the Relators forward to report Defendants' fraud and abuse.

## GOVERNING REGULATIONS

91.     Generally, Medicare Part A (Hospital Insurance) covers inpatient hospital services and Medicare Part B covers outpatient hospital services including care in the emergency department. Medicare Part B will also cover most doctor services when a beneficiary receives inpatient services.

92.     CMS defines an inpatient as "a person who has been admitted to a hospital for bed occupancy purposes of receiving inpatient hospital services. Generally, a patient is considered an inpatient if formally admitted with the expectation that he or she will require hospital care that is expected to span at least two midnights and occupy a bed even though it later develops that the patient can be discharged or transferred to another hospital and not actually use a hospital bed overnight." Medicare Benefit Policy Manual, *Chapter 1 – Inpatient Hospital Services Covered Under Part A,* Revised 08-06-21.

93.     CMS considers a patient receiving emergency department services, observation services, outpatient surgery, lab tests, X-rays, or any other hospital services when not admitted to a hospital bed to be an outpatient, even if the patient spends the night in the hospital.

94.     Section 1886(d) of the Social Security Act (the Act) sets forth a system of payment for the operating costs of acute care hospital inpatient stays under Medicare Part A (Hospital Insurance) based on prospectively set rates. This payment system is referred to as the inpatient prospective payment system (IPPS). Under the IPPS, each case is categorized into a diagnosis-related group (DRG). Each DRG has a payment weight assigned to it, based on the average resources used to treat Medicare patients in that DRG.

95.     The base payment rate is divided into a labor-related and non-labor share. The labor-related share is adjusted by the wage index applicable to the area where the hospital is located, and if the hospital is located in Alaska or Hawaii, the nonlabor share is further adjusted by a cost-of-living adjustment factor. This base payment rate is multiplied by the DRG relative weight.

96.     If the hospital treats a high-percentage of low-income patients, it receives a percentage add-on payment applied to the DRG-adjusted base payment rate. This add-on, known as the disproportionate share hospital (DSH) adjustment, provides for a percentage increase in Medicare payment for hospitals that qualify

under either of two statutory formulas designed to identify hospitals that serve a disproportionate share of low-income patients. For qualifying hospitals, the amount of this adjustment may vary based on the outcome of the statutory calculation.

97. Also, if the hospital is an approved teaching hospital it receives a percentage add-on payment for each case paid through IPPS. This add-on is known as the indirect medical education (IME) adjustment, varies depending on the ratio of residents-to-beds under the IPPS for operating costs, and according to the ratio of residents-to-average daily census under the IPPS for capital costs.

98. Finally, for particular cases that are unusually costly, known as outlier cases, the IPPS payment is increased. This additional payment is designed to protect the hospital from large financial losses due to unusually expensive cases. Any outlier payment due is added to the DRG-adjusted base payment rate, plus any DSH or IME adjustments.

99. For services provided to outpatients, hospitals are reimbursed based upon the outpatient prospective payment system ("OPPS"). Under this system, the hospital submits Medicare claims based upon the individual services rendered to a beneficiary. It is widely known that hospitals receive significantly greater reimbursement from the IPPS than the OPPS.

100. CMS describes observations services as "clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment,

that are furnished while a decision is being made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital. Observation services are commonly ordered for patients who present to the **emergency department** and who then require a significant period of treatment or monitoring in order to make a decision concerning their admission or discharge." Medicare Claims Processing Manual, *Chapter 4 – Part B Hospital*, Transmittal 290.1 – Observation Services Overview, Implemented 07-06-09 (emphasis added).

101.   As discussed above, reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each MA Plan for each enrolled individual, i.e., a capitated payment, the amount of which is determined, in part, by the MA Plan's expenditures on patient care. The MA Plans are Government contractors, and claims made to the MA Plans by contracted providers are for money that is spent or used on the Government's behalf or to advance a Government program or interest.

**TENET'S FRAUDULENT CONDUCT**

102.   Co-Relators all primarily treat or have primarily treated patients at the DMC's Detroit Receiving Hospital, but they do provide services at other DMC hospitals and thus are well aware that that these fraudulent practices exist throughout DMC's acute care hospitals, especially in Sinai-Grace.

103.   Detroit Receiving Hospital's emergency department has approximately sixty beds. However, beginning in 2020, it was not uncommon for there to be as many as ninety patients being boarded in Detroit Receiving Hospital's emergency department waiting for an inpatient bed, even though an admission order had already been issued.

104.   Despite this, Defendants bill CMS and government payors as if the boarded patient had been moved to the appropriate inpatient department and was receiving inpatient care—meanwhile, many times the patient was simply sitting in a hallway on a gurney, receiving no care at all.

105.   Doctors and staff at Detroit Receiving Hospital are extremely concerned with the level of care being provided to boarded patients and go as far as to call the situation unsafe for patients.

106.   Thus, not only are Defendants billing for inpatient services that were never provided, patients are held instead in an unsafe environment without even basic, observational levels of care.

107.   As noted above, to the best of Relators' recollection, ER boarding at Detroit Receiving Hospital became an issue with the onslaught of the global COVID-19 pandemic. However, now more than three years beyond the advent of COVID-19, the Tenet-managed facility continues to board ER patients and fraudulently bill them as inpatients.

108.   In fact, the boarding of ER patients by Defendants does not correlate to the rise and fall of COVID infections and appears to have increased over time.

109.   Both Defendants and their respective management are very aware of both the issue involving ER overcrowding/boarding and ER patients being billed as inpatients.

110.   In some instances, ER boarded patients remain in the ER for as many as **eight or nine days** before being transferred to an inpatient department.

111.   This results in **more than a week of fraudulent inpatient billing per patient.**

112.   This protocol is well known amongst ER physicians and inpatient physicians alike, as well as the DMC's executive management team.

113.   Exemplifying this, the then-Chief of Emergency Medicine at Detroit Receiving Hospital sent an email dated January 20, 2022 to various Tenet executives, including the DMC's Chief Executive Officer of DMC Adult Central Campus, laying out "some of the questions my docs are wanting to get answered. I know we won't have time for them all." The email goes on to list eight questions, number two of which states, "[L]ast time I checked, there were 99 patients in the ER: 86 boarded and 13 active. What is being done to address boarding particularly as it pertains to upstairs nursing staff[?]"

114.   Furthermore, the fourth item in this email states, "I have personally witnessed patients in hallways get the wrong medication because they were mixed up with another patient, had a hallway patient who was thought to have left who was still there, seen a patient in the hallway fall and get a subdural hematoma, multiple [sic] run out of oxygen. How is having overflowing hallway patients safer than double bunking?"

115.   Finally, the fifth item in this email references billing ER boarded patients as inpatients and asks, "[A]t what point is patient care considered to be transferred to the upstairs team. **It is my understanding that the upstairs team collects fee for services provided once the admission order is placed**. Is it fair or ethical to have the ER providing medical services for free when the upstairs doctors cannot be reached? Is there a window of time where there is a gray area? First 12 hrs., 24 hrs. etc., that seems reasonable. Certainly 100+ hrs. does not."  (emphasis added).

116.   This email (and others like it) has made it clear to Tenet executives that the common practice of ER boarding at the DMC results in fraudulent inpatient billing, severely substandard care for ER boarded patients, and bad patient outcomes.

117.   Despite its clarity, the January 20, 2022 email met with no meaningful response.

118.   In fact, the same protocol exists to this day, without billing or patient care changing in any way.

## PATIENT HARM

119.   In addition to fraudulently billing government payors for inpatient care not delivered, patients being boarded in the ER at Defendants' hospitals frequently receive substandard care leading to patient harm, sometimes even death.

120.   As noted, Defendants simply choose not to expend their record-breaking profits (a percentage of which are from federal relief dollars) to provide adequate care. And of course, if Defendants chose to transfer an ER patient with an admit order to another facility, they would lose the opportunity to bill for that patient's care.

121.   Below are five examples of patients who were harmed by these practices. Although egregious, these are by no means the only examples.

122.   Patient 1 was admitted to Detroit Receiving Hospital's ER from a nursing home with a diagnosis of Sepsis. Patient 1 had an admit order date to the ICU of August 2, 2022 at 02:43.

123.   Patient 1 was boarded in Detroit Receiving Hospital's ER for almost seven days awaiting an inpatient bed, while the records were maintained as if the patient had been properly admitted and was receiving inpatient care.

124.   Eventually, a proper transfer to an inpatient unit was documented in the patient's chart.

125.   Relators note that Patient 1's medical chart does not reflect ICU level care; in fact, his chart does not document vitals being checked and has no nursing notes in the chart for over 135 hours.

126.   Sadly, but not surprisingly, Patient 1 died on August 16, 2022.

127.   Patient 2 has an admit order to the Neuro ICU on August 4, 2022 at 17:39 with a diagnosis of alcoholism, encephalopathy, and a urinary tract infection.

128.   Patient 2 was boarded in the ER for approximately 3 days before being properly transferred to the ICU on August 7, 2022 at 14:42.

129.   Relators review of Patient 2's medical chart reveals that while in the ER supposedly receiving (and being billed for) inpatient care, Patient 2 was not properly started on feeding, vitals were not checked, and he was not started on a long-term EEG as requested by neurology consultants.

130.   Patient 3 presented to the ER at Detroit Receiving Hospital with an infected corneal ulcer in her eye, and was prescribed eyedrops every hour.

131.   Because of the critical nature of the care, Patient 3 received an admit order to DRH's ICU on February 22, 2022 at 19:23, because that was the only department capable of monitoring and delivering hourly eyedrops.

132.   Unfortunately, Patient 3 was boarded in the ER for approximately eight days without receiving the hourly eyedrops she required.

133.   As a result, she sustained a rupture of her eyeglobe, necessitating its removal. She was finally transferred to the ICU on March 2, 2022.

134.   The substandard care Patient 3 received was billed as if it were inpatient ICU care, despite being in the ER for close to eight days.

135.   Patient 4 was a 78-year-old female who presented to the ER at Detroit Receiving Hospital severely ill with sepsis, rhabdomyolysis, severe dehydration, and hyperosmolar coma.

136.   Patient 4 had an admit order to the MICU on December 23, 2021 at 18:51.

137.   Patient 4 was "downgraded to floor bed" from ICU status on December 26, 2021, although she remained in the ER the entire time, until she was properly transferred to a floor bed on December 29, 2021 at 23:50.

138.   Patient 4 was boarded in the ER in excess of six days, despite her chart indicating she needed ICU care (for three days) and an inpatient floor admission (for the other three days).

139.   Relator Matthews personally found Patient 4 in her own urine and stool, and due to this improper care, Patient 4 developed decubitus ulcers during her more than six days in the ED.

140.   Again, Patient 4's care was billed as if she were cared for as a proper inpatient both in the MICU and a floor bed—even though neither occurred—for six days.

141.   Patient 5 was an 88-year-old male who presented to Detroit Receiving Hospital's ER with respiratory failure due to COVID-19.

142.   Patient 5 had an admit order of August 3, 2022.

143.   Patient 5 died in the ER after being boarded there for approximately thirty-six hours.

144.   Nursing notes indicate that Patient 5 was found expired on August 4, 2022 at 22:40, with his BiPAP breathing apparatus disconnected. It is unknown when the BiPAP was removed or when exactly Patient 5 died.

145.   Patient 5's care was billed as inpatient care while he was in the ER and apparently during the time during which he lay deceased, with no one even monitoring whether his BiPAP apparatus was properly engaged.

146.   Patient 6 was a 79-year-old female admitted by a DMC physician for low hemoglobin; she was very ill when admitted but cognitively fine.

147.   Patient 6 remained sitting in the hallway for a day, such that when the physician returned to the hospital after going home to sleep, Patient 6 was in the hallway unattended in front of some linen cabinets, lying in her own feces and urine.

148.   Patient 6 was dehydrated and stated that she had been given no water, by anyone, for the entire time she was parked in the public hallway.

149.   Patient 6 tearfully told the physician she would rather die than spend any more time in the ER.

150.   By the end of her stay, Patient 6 had Covid.

151.   No one had monitored Patient 6's hemoglobin the entire time from when a physician admitted her for low hemoglobin and when that same physician returned for a different shift.

152.   This abhorrent care does not meet any of the basic requirements for ER and ICU care. But based on past practice, the Co-Relators are confident that Tenet still billed for it.

## BOARDING LENGTHS ARE METICULOUSLY TRACKED

153.   Defendants are very well aware of and track down to the hour, the amount of time ER boarded patients wait in the ER for an inpatient bed.

154.   Each morning, the Executive Management Team is provided with the "ED Morning Report," along with an email containing additional statistics on ER patients.

155.   The report details the ED's census from the day before and includes the number of patients who had inpatient admit orders but were being boarded in the ER due to lack of beds.

156.   The ER Morning Report includes the ER boarding numbers for Detroit Receiving Hospital as well as another of the DMC's acute care hospitals, Harper University Hospital ("Harper").

157.   For example, the June 27, 2022, ER Morning Report shows sixty-two patients with admit orders being held in Detroit Receiving Hospital's ER and forty-seven patients with admit orders being held in Harper's ED.

158.   That report also states that "Harper continue[s] to have a high number of Tele patients in the ER with over 100 hours that need to be reevaluated and documented in the medical record."

159.   In other words, a "high number" of patients with admit orders to Harper's telemetry unit have been in the ER for over 100 hours, or more than 4 days.

160.   These patients were all billed as if they were receiving care in the telemetry unit for the duration of their 100 plus hour wait in the ER, while not receiving actual inpatient care.

161.   Another example, the June 11, 2022, ER Morning Report documents a smaller number of twenty-five patients with inpatient admit orders being boarded at Detroit Receiving Hospital and twenty-nine at Harper.

162.   However, the report states that the "[L]ongest stay patient at [Detroit Receiving Hospital] is 178 hours (over 7 days) and at Harper it is 85 hours (over 3

days)." Again, these patients were billed as inpatients despite being physically held in the EDs of both hospitals while not receiving inpatient level of care.

163.   Defendants created the ER Morning Report to track boarded patients and relevant statistics.

164.   Prior to the advent of the ER Morning Report, Defendants also had an automated email entitled "Emergency Department Capacity Alert."

165.   The Emergency Department Capacity Alert would automatically be sent to certain department heads at Detroit Receiving Hospital to alert them to begin alleviating the capacity issue—in other words, discharging patients from the ER if at all possible. Likewise, the ER Morning Reports sometimes instruct to "activate ER decompression plan" when ER boarding reached a certain threshold. Again, the decompression plan was simply to discharge ER patients if it was at all possible.

166.   By way of example, the January 24, 2021, Emergency Department Capacity Alert documents that Detroit Receiving Hospital began the day with twenty-one admitted patients being boarded/held in the ER and twenty-four by the end of the day.

167.   The number of patients being boarded in both Detroit Receiving Hospital's and Harper's EDs increased in 2022 over that which is documented in the Emergency Department Capacity Alerts, which are dated in early 2021—a time when the COVID19 pandemic numbers were higher.

168.   This suggests that the issue of ER boarding is not in fact related to COVID19, but instead is a product of decisions by Defendants to hold patients without proper care in the EDs of its hospitals while billing for a higher level of inpatient care.

169.   Defendants possess yet another internal tool to track the number of patients it is boarding awaiting inpatient care. Defendants' have what is called the "ED Tracking Board" for each ED at its acute hospitals.

170.   The purpose of this spreadsheet, created from its Cerner software system, is to provide a real-time census of ED ER patients, including whether they have an admission order, how long they have been held in the ED, and other information relevant to the care of the patient.

171.   Detroit Receiving Hospital's ER Tracking Board for December 6, 2022 identifies sixty patients as being boarded in the ER at Detroit Receiving Hospital, with patients listed in order of longest boarding time to the least amount of boarding time. This number is significantly higher than typical boarding numbers seen in 2021, as documented in the Emergency Department Capacity Alerts referenced above.

172.   Astonishingly, forty-four of the sixty patients identified by the ER Tracking Board for December 6, 2022 had been held in the ER for longer than 24 hours.

173.   Even more astounding, the ER Tracking Board identifies twelve Detroit Receiving Hospital patients who had been boarded in the ER for more than 100 hours (4.16 days) with the longest length of stay being an incredible 165 hours (approximately a week).

174.   All but one of the twelve patients held in the ER for an excess of 100 hours had inpatient admit orders. These eleven patients, per Defendants' protocol, were billed as inpatients despite being held in the ER for multiple days.

175.   In addition, a document entitled "DRH Operations Scorecard" tracks the total number of hours patients are boarded in the ER by each calendar month.

176.   This document shows that for each month in 2022, patients spent thousands of hours each month boarded in the ER while defendants billed that time as inpatient services.

177.   For example, in December 2022, patients spent a total of 24,246 hours boarded in the ER at Detroit Receiving Hospital. Again, Defendants consider a patient to be boarded in the ER only after an admit order has been issued and inpatient services are being billed. For December 2022 alone, that equates to billing more than one thousand inpatient treatment days for patients simply being held in Detroit Receiving Hospital's ED.

## DRH HUDDLE DASHBOARD SPREADSHEETS

178. Detroit Receiving Hospital maintains a "DRH Huddle Dashboard." These are daily spreadsheets which track the total patient census at Detroit Receiving Hospital, including patients in the ED. As physicians at Detroit Receiving Hospital, Relators have access to these Dashboards as part of their job functions.

179. Among other items, the spreadsheets contain a "Current Census" tab, which provides key patient information, including the patient's location within Detroit Receiving Hospital.

180. Co-Relators estimate that 70-80% of ER patients are government health program beneficiaries and the DRH Huddle Dashboard spreadsheets support this understanding: a majority of ER patients have a financial class listed as Medicare, Medicare Advantage, Medicaid, etc.

181. The DRH Huddle Dashboard spreadsheet for August 1, 2022 identifies thirty-three ER boarded patients. Only two of the thirty-three patients had an inpatient admit time and date of August 1, 2022. This means that the thirty-one other ER patients had inpatient admit dates of July 31, 2022 or earlier, while being held in the ER and billed as if they were being treated in an inpatient unit at Detroit Receiving Hospital.

182. The August 1, 2022 DRH Huddle Dashboard spreadsheet indicates that four of the ER boarded patients had been held in the ER for greater than four days

while inpatient services were billed. Of note, all four of the ER boarded patients with a length of stay longer than four days in the August 1, 2022 DRH Huddle Dashboard spreadsheet are identified as either Medicaid or Medicare Advantage beneficiaries.

183. The DRH Huddle Dashboard spreadsheets provide a wealth of data and confirm the factual allegations of Relators down to exact patients by day and payor.

184. Defendants have all of this data and know exactly how many patients are simply being held in the ER while they bill for inpatient services that are not being provided.

### **DEFENDANTS' EFFORTS TO CONCEAL THE FRAUD**

185. Defendants have gone to great lengths to hide these problems. One day in June 2021, Dr. Olsen was working in Detroit Receiving Hospital's ER and was pleasantly surprised to see that the hospital actually had enough staff to provide the required care.

186. Dr. Olsen briefly thought that Tenet had finally decided to increase staffing to medically necessary levels. He was surprised, however, that it had been remedied seemingly overnight.

187. Dr. Olsen texted the department director asking how there was suddenly adequate staff, when every day for months there had been stretchers in the hallways and ICU patients in the department for more than 24 hours.

188.   That's when he discovered the truth: Tenet had hired marketers to take pictures that day and so wanted the ER to look properly staffed. Once the marketing shoots were complete, most of the staff disappeared.

189.   Tenet administrators routinely claim in meetings that they are trying to hire more staff to address the problem. Yet they are running the DMC with typical "profit over patients" designs to keep staffing extremely low to maximize profits. While this may make sense in other industries, in hospitals, it hurts patients and leads to inflated and fraudulent charges.

190.   The Director of Medical Education raised concerns with Tenet that the number of non-care requirements for residents is falling outside of Accreditation Counsel for Graduate Medical Education ("ACGME") Guidelines and thus the DMC should retain more staff before its residencies are put in jeopardy. Such concerns, like all the others, have been rebuffed.

191.   At a recent Graduate Medical Education Executive Committee Meeting attended by Dr. Olsen in his role as the ER Residency Director for Detroit Receiving, the DMC's CEO, Brittany Lavis, claimed Tenet is doing everything it can to hire more staff, and she requested that all residency directors submit ideas about how to retain and recruit staff. In response, Dr. Olsen came up with a process to hire young people (18-21) from Wayne State University who could be given a small amount of

training and then become technicians or nurses. A program called DMC Jumpstart was initiated, but later abandoned as everyone who ran it left the DMC.

192.   Physician meetings virtually always include both discussion of lack of staff and poor outcomes because of the lack of required staff. For example, the May 2022 meeting included a discussion about delay providing an EKG, a patient with severe burn that needed an operation to restore blood flow but instead waited in the lobby, a hallway patient who ran out of oxygen in the hallway, and other egregious care issues that would never occur if true acute-level care was being provided.

193.   Tenet has not changed its billing practices to reflect what is actually occurring in the DMC ERs (and the rest of the hospitals).

194.   To make a show of addressing problems, Tenet encourages physicians to report concerns on the MIDAS electronic database system, a system for anonymously reporting patient safety concerns. However, the Tenet MIDAS system is only a way to put information in, and—seemingly by design—doctors have no way to follow up or track information. Multiple times, Dr. Olsen entered his full name and phone number into MIDAS reports and asked for follow-up in attempt to get some traction addressing the problem, but he received no response. He then began backing up his MIDAS reports with emails. In any case, MIDAS reports would not show fraudulent billing, only patient outcomes.

195.   Tenet has publicly punished and even fired staff who are vocal about problems caused by its low staffing levels.[5]

196.   The staffing shortages at the DMC are particularly galling because the DMC is no longer a charitable organization struggling to make ends meet; it is owned by a highly profitable corporation that just received $2 billion in federal aid.

197.   Tenet has the funds to provide the care, and they are billing for the care, but they refuse to spend funds on that care, instead bolstering its profits on the backs of taxpayers.

## COUNT I
## VIOLATIONS OF 31 U.S.C. § 3729 – FEDERAL FCA

198.   Relators hereby incorporate and reallege all other paragraphs as if fully set forth herein.

199.   As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

200.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

---

[5] Tenet Sued After Firing Detroit Nurses Who Complained About COVID Understaffing | MedPage Today

201.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. 31 U.S.C. § 3729.

202.   Relators are entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## <u>COUNT II</u>
## VIOLATIONS OF MICHIGAN COMPILED LAWS 400.601 et seq. – MICHIGAN MEDICAID FALSE CLAIMS ACT

203.   Relators hereby incorporate and reallege all other paragraphs as if fully set forth herein.

204.    As set forth above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid program false or fraudulent claims for payment or approval, in violation of Mich. Comp. Laws § 400.607(1).

205.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of Mich. Comp. Laws § 400.607(3).

206.   Due to Defendants' conduct, the State of Michigan has suffered monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. Mich. Comp. Laws § 400.612(1).

207.   Relators are entitled to reasonable attorneys' fees, costs, and expenses pursuant to Mich. Comp. Laws § 400.610a(9).

## **PRAYER FOR RELIEF**

WHEREFORE, Relators pray for judgment against Defendants:

(a) awarding the United States treble damages sustained by it for each of
the false claims;

(b) awarding the United States a maximum civil penalty for each of the
false claims, records, and statements;

(c) awarding the State of Michigan treble damages sustained by it for
each of the false claims;

(d) awarding the State of Michigan the maximum civil penalty for each of
the false claims, records, and statements;

(e) awarding Relators the maximum share of the proceeds of this action
and any alternate remedy or the settlement of any such claim;

(f) awarding Relators litigation costs and reasonable attorneys' fees; and

(g) granting such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Relators hereby respectfully demand trial by jury on all issues and counts
triable as of right before a jury.

Respectfully submitted,

*/s/ Sara K. MacWilliams*
Sara K. MacWilliams (P67805)
Derek Howard (P69625)
**Doerr MacWilliams Howard PLLC**

838 W. Long Lake Road, Suite 211
Bloomfield Hills, MI 48302
sara@dmhlawyers.com
derek@dmhlaywers.com
(248) 432-1586

/s/*Azzam Elder*
Azzam Elder (P53661)
**Elder Brinkman, PLLC**
1360 Porter St. Suite 250
Dearborn, MI 48124
aelder@elderbrinkmanlaw.com
Telephone: (313) 582-5800


/s/ *Julie Bracker*
Julie Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3355 Lenox Road, Suite 660
Atlanta, Georgia 30326
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com


*Attorneys for Plaintiff-Relators*

Dated: January 18, 2024